## E. A. PRICE v. J. E. BURKE.

(145 N. W. 405.)

**Evidence — recovery — mechanics' lien — foreclosure — contract — owner — authorized agent — knowledge — ratification.**

   Evidence examined, and *held* insufficient to establish a right to recover, it

27 N. D.—5.

not appearing that the purported improvement for which the mechanics' lien was claimed and is sought to be foreclosed, a well, was dug under an express contract contract with the owner or his authorized agent; nor is it established that defendant, before the completion of the work, had knowledge that the same was being done, or that he has subsequently ratified the same.

Opinion filed January 20, 1914.   Rehearing denied February 11, 1914.

From a judgment of the District Court of Ward County, *Leighton,* J., dismissing this action, plaintiff appeals.

Affirmed.

*F. B. Lambert,* for appellant.

The right to a mechanics' lien is not necessarily based on an express contract.  It may arise and exist under an *implied* contract.  Rev. Codes 1905, § 5339.

The question of *consent* is clearly interwoven with *knowledge.*  Rockel, Mechanics' Liens, § 35, p. 89, notes 12, 13; Abbot v. Third School Dist, 7 Me. 118; Hayden v. Madison, 7 Me. 76; Day v. Caton, 119 Mass. 513, 20 Am. Rep. 347; Lamb v. Bunce, 4 Maule & S. 275, 16 Revised Rep. 470; Connor v. Hackley, 2 Met. 613; Preston v. American Linen Co. 119 Mass. 400.

Where a party knowingly and without objection permits another to render service for him, the law implies a promise to pay.  Garrey v. Stadler, 67 Wis. 512, 58 Am. Rep. 877, 30 N. W. 789; Bloom, Mechanics' Liens, § 475, p. 434, note 15; 27 Cyc. 73, cases in note 16; Phillips. v. Clark, 4 Met. (Ky.), 348, 83 Am. Dec. 491; Barclay v. Wainwright, 86 Pa. 191; Stepina v. Conklin Lumber Co. 134 Ill. App. 173; Cannon v. Felfrick, 99 Ind. 164; Phelps v. Maxwell's Creek Gold Min. Co: 49 Cal. 336.

The burden of proof is upon the lien claimant to show knowledge of the owner.  Such burden has been amply met.  Dodge v. Romain, — N. J. —, 18 Atl. 114.

*Palda, Aaker, & Green* and *I. M. Oseth,* for respondent.

Findings of the trial court upon an issue of title by adverse possession may not be disturbed on appeal, when not clearly against the evidence.  Chadderdon v. Maxwell, 175 Mich. 709, 141 N. W. 596; Eyre v. Faribault, 121 Minn. 233, — L.R.A.(N.S.) —, 141 N. W. 170; Independent Pub. Co. v. Stanley County, — S. D. —, 141 N. W. 366; Kroeger v. Warren, — S. D —, 141 N. W. 395.

Equitable issues may be reviewed or tried anew in the appellate court, but issues of law will *not* be reviewed or retried. Laffy v. Gordon, 15 N. D. 282, 107 N. W. 969.

The supreme court will not determine the credibility of the witness· es or the weight of their testimony. Mitchell v. Des Moines City R. Co. — Iowa, —, 141 N. W. 43; Moriarty v. Maloney, 121 Minn. 285, 141 N. W. 186; Wolf v. Ranck, — Iowa, —, 141 N. W. 442; State ex rel. Rice v. Chicago, M. & P. S. R. Co. — S. D. —, 141 N. W. 473; Taute v. J. I. Case Threshing Mach. Co. — N. D. —, 141 N. W. 134.

Goss, J. The decision of this case involves little more than a review of fact only. It is an equitable action brought to establish a right to recovery for alleged improvements to realty by foreclosure of a mechanics' lien. The improvement was a deep well alleged as drilled under contract between the well digger, Price, and Burke, the owner of the land.

Some facts are uncontroverted, but as to the greater portion a square conflict exists in the evidence. The well was drilled by the plaintiff to a depth of 401 feet, for which he has filed his lien for $601.50, or at the alleged agreed rate of $1.50 a foot. The well drilling was done after an interview plaintiff had with defendant in Velva, on June 3, 1907. What was there said is in direct conflict, plaintiff claiming that Burke then gave him authority to see Myatt, Burke's tenant on the land, and that whatever Myatt authorized done would be all right, and that he had to have a well. Plaintiff testifies he then told Burke that his price was $1.50 a foot, everything furnished, and that Burke told him he wanted everything furnished as he was to be away at Willeston or Montana for a considerable time, and could not look after it himself, and in effect authorized Price to deal with the tenant Myatt. All parties agree that a conversation occurred between Price and Burke at said place and date, that Sunday afternoon, as they were coming from a ball game. Burke denies plaintiff's statement of the conversation, and testifies that he was accosted by plaintiff, who told him his business, and "said that he understood I had trouble getting water enough at my farm, and I told him I had. He said he was a well driller and wanted to know if he could make a well for me, and I told him no, I had already made arrangements to fix the well I had on the place." That he

had no further conversation whatever with Price; that he did not refer Price to Myatt; that "I did not speak to him more than two seconds; I told him that I had already told Myatt what to do with the well, fix up the old well." That nothing was said in regard to the price of digging wells nor about a pump for the well. Burke testifies that the only authority in the matter he had given to Myatt was to dig down deeper a well already upon the place; that such well already there had been in use for five years and had always before furnished plenty of water for farm use; that he had never authorized the drilling of a well or anything more than the mere digging out of the old one; that this moment's talk was the only conversation he says he had with Price until after the completion of the well. Concerning the Velva incident, Burke is corroborated by Joe Strong, who, when asked to state what he recollected of the conversation, says: "Well, there was not much conversation; Price asked him in regard to digging a well, and Burke said he had made arrangements with Myatt out there to dig down the well. It only lasted about a minute or half a minute. That was all that was said. There was nothing talked about the price of drilling a well or anything of that kind. They did not talk together after that. Burke walked down town (from the place where the talk occurred) with me and Flatner; we all walked down together." On cross-examination he testified: "Burke said he had made arrangements with Myatt to look after the well;" which statement was explained on redirect examination to mean the well he was going to have "dug down or dug out." Price had been looking for work and had previously asked Myatt for the job of drilling a well, and Myatt had referred him to Burke.

Price says he started in at drilling the well after he had procured from Myatt consent to do the work, he informing Myatt of the price he would charge. The work was begun on the 19th, 20th, or 21st of June, according to plaintiff's testimony, he being uncertain as to the exact date, and he testifies the well was completed some time from the 11th to the 16th of July, being uncertain as to that date also, which date is very material, as will hereafter appear. The bill attached to the verified lien claim recites the commencement of the work on June 19th, and its completion July 11, 1907, and that the same was done under a contract made by plaintiff with the defendant on June 17th, or as would appear, two days before the work was commenced. The date of the veri-

fication of this lien, filed September 3, 1907, is August 29, 1907. This was after the presentation to Burke of a bill for the work, which bill is dated July 23d, and is in evidence as Exhibit A, and is stamped received by Burke July 26, 1907, and answered by him July 27, 1907. It thus appears that the mechanics' lien was prepared within a day after the receipt of the answer to the presentation of the claim, evidently adverse to payment, or the lien would not have been filed forthwith.

Burke appeared at his farm again July 12th, or nearly six weeks after the talk had with Price in Velva, Burke making the trip to his farm with an automobile from Sawyer, and then discovered, as he says for the first time, the well in question, and that the same was already completed. That Price was away; that one Newman was there with the well-drilling outfit; that he started to talk with Newman; that he was sore about them being there, and Newman told him he had nothing to do with it or with the outfit; that it used to belong to him, but Price had the job; that he asked him where Price was and was told he had gone to Sawyer; that he then found Myatt and wanted to know what they were doing and what authority Myatt had for doing that, and he was then told by Myatt that Price had informed Myatt that he, Price, had seen Burke in Velva and had made arrangements with him, Burke, and that he, Myatt, considered he had nothing to do with it, and was sore because Burke blamed him for it. At that time they had pumped the well and had made ditches to drain off the water, and the water so pumped had splashed all over. Burke was positive that this was on the 12th day of July, fixing the date from memoranda and his whereabouts and other events; that he was then told by Newman in charge of the outfit, "they were down 401 feet and the water supply was sufficient," and that they had pumped it four days in testing it. Myatt did not testify, the inference from the testimony being that he had left the country. Burke traced his own whereabouts from the 3d day of June until the 12th of July. It appears that he was in Bismarck June 4th and obtained a pardon for one Alice Hale, leaving Bismarck for Detroit, Minnesota, where he attended a wedding June 5th, leaving there for Fargo and Minneapolis, returning to Minot June 9th, then going to Towner, and on June 12th to Berthold, on the 13th to Williston, and on the 14th to Poplar, Montana, returning to Minot June 18th, and going back to Williston on the 19th, then engaging from June 20th un-

til July 6th in the trial of the Heddrick will case, in which trial he was one of counsel engaged. Witness then returned from Williston, went to Towner, Minot, and Velva, and from there to the farm. Witness testifies from memoranda consisting of sleeping car checks and checks drawn by him, to fix dates, refreshing his recollection, and from which witness is able to fix positively the date of his only visit to the farm as of the 12th of July, 1907. The importance of fixing the date of this visit with reference to the time of completion of this well is the question decisive of this case. If the well was completed in advance of the visit, then all the work was done before Burke had any notice that plaintiff was drilling the well. Such was Burke's contention, and the one evidently accepted as the fact by the trial court. If he had known such work was in progress and made no objection and allowed its completion, then under § 6237, Rev. Codes 1905, he as owner would "be presumed to have consented to the doing of any such labor or the making of any such improvement, if, at the time, he had knowledge thereof and did not give notice of his objection thereto to the person entitled to the lien." Plaintiff's own testimony as to the date of his completion of the work is wholly indefinite. In his direct examination he says: "Think we finished up the 16th day of July." Again on cross-examination he was asked: "When do you claim you finished the well?" To which he answered: "Some time from the 11th to the 15th day of July, I could not say the date." In his sworn statement of lien, he has fixed July 11th as the date of completion, and this date was fixed by him, the date of the lien being August 29, 1907, about six weeks after the completion of the work, while his testimony concerning the date was given four years after the work was done, and nothing is shown from which the witness could refresh his recollection as to dates, and with the witness probably testifying with knowledge of the necessity, to enable plaintiff to recover, of fixing the date of completion as after the time of the visit by Burke to the farm and his acquisition of knowledge of the work. It is true Price has testified to having seen and talked with Burke about the well once after the initial conversation, June 3d, which second conversation he places as occurring "while we were working there." And again: "It must have been somewhere around about the latter part of June." He was then asked: "Who was present at that conversation?" To which he answered: "Nobody but himself and me."

He then testifies he never saw Burke on the farm, but "once after-wards I did."

Q. When?

A. A few days.

Q. After what?

A. After he was out there the first time.

Q. When was that?

A. I cannot tell the date.

Q. About when?

A. Sometime in June or July, while we were working at the well.

Q. How long before you finished this well do you claim you talked to Burke at the farm?

A. I did not talk to him at the farm; I talked to him in Sawyer.

Q. Didn't have any talk with him at the farm?

A. Not a word.

Q. Where was he on the farm when you claim you saw him?

A. In the yard in an automobile.

Q. Drove right out again?

A. He was there a few minutes talking to his tenant, and they went off.

Then again he gave the following testimony:

I think we finished up on the 16th day of July.

Q. During the time did you see anything of Burke, the defendant?

A. Yes, sir.

Q. When and where did you see him?

A. I saw him at the farm there once, and I met him on the road and talked to him in Sawyer after he had been out.

Q. Were you drilling?

A. I had come to town for some gasoline.

Q. Where did you first see him that day?

A. Just before he got to his place in an automobile.

Q. Before he turned in?

A. Just within half or three quarters of a mile.

Q. He was headed toward his farm?

A. Yes, sir.

Q. When did you see him again?

A. I saw him that same day after he came back to town.

Q. Whereabouts?

A. In Sawyer.

Q. What talk did you have with him that day?

A. Just a few words. He says, "You are getting down quite deep." I says, "Yes, deeper than we expected."

He says, "Well, I have got to have water."

Q. Did you finish the well complete?

A. Yes.

Q. Did you test it?

A. Yes, sir.

Q. What test did you make, what did it stand?

A. We pumped it thirty-six hours with a gasoline engine and it was working as well as any well could be made to work.

Q. You kept it going steady for thirty-six hours?

A. Yes, about in that neighborhood, but I would not swear to the exact time, but we pumped it for practically three days.

Then again the plaintiff gave the following testimony under cross-examination:

Q. You talked with him again after that in Minot?

A. I talked to him after that on the train going down.

Q. You did not talk to him at his place?

A. No, sir.

Q. You did not see him on the place, did you?

A. No, sir.

And witness testifies to an offer of compromise settlement made by Burke to him. And again: "Just shortly after the well was done I told him the well was done. He said, 'All right, send me your statement and I will send you a check.' I done so and I did not hear anything of him. The next I came up to see him he said he was too busy to talk to me. We were going down on the train and he would settle on the train." It was then that an offer of compromise was made by Burke. One Larent and wife were working for Myatt on Burke's farm and they both testify to Burke telling Myatt to go ahead and put the well down, but as to whether this was in reference to the well in the *coulée*

or the drilling of a new well, their testimony is merely their conclusion or inference. And in addition thereto they testify to the following: "Price told Myatt that he heard that he wanted to put a well down, get a well, and Myatt said he did; and so Price told him what he would put the well down for, and Myatt said it was all right with him to have the well dug." This contradicts plaintiff's own testimony and theory of his case, based upon an express contract with Burke made at Velva.

Q. What did he say the price was?
A. $1.50 a foot.
Q. Anything else said about Burke?
A. Price said he didn't want to put the well down until he saw Burke.
Q. Do you remember seeing Burke there during that time? (referring to while the well was being drilled).
A. Yes, sir.
Q. How many times.
A. One that I know of.
Q. What was he there with?
A. With an automobile.
Q. Do you know who was there with him?
A. No, there was another man, but he was a stranger to me.

Then on cross-examination Larent gave the following testimony:
Q. Was he there when they were drilling or pumping?
A. They were drilling.
Q. Weren't they through pumping at that time, after those three or four days' pumping you talked about?
A. No, sir, he was there during the time they were drilling; they had just started a little while; I don't know how long they had drilled before he came out there.
Q. How do you fix it they were drilling?
A. Price went to town for gasolene the same day Burke was there.

This is the same trip Price says he made for gasoline, and identifies the visit as the one Burke admits having made July 12th. Other wit-

nesses testify to having used the well themselves, or seen others use the well that year.

Burke denies ever having had the conversation in Sawyer above referred to, but says that he met a team on this trip to the farm on July 12th, and that the team was frightened, and while he did not recognize Price, yet it might have been he. Plaintiff's witness Newman also testifies that Burke was at the farm twice while the well was being drilled; that they were drilling while he was there; that they tested the well by pumping it with a gasoline engine for three days; that he was working for Price at the time, but had just before commencement of this job sold Price the well-boring outfit with which the work was done, and to that extent is an interested party in this suit. He does not know the date of the completion of the well; that he had talked to Myatt about the digging of this well before he sold the well machine used in digging it to Price. Burke's testimony is that he had no knowledge of the well being bored until it was completed; that he never had any talk with Price in Sawyer or Velva except the time he told him he did not want him to drill a well; that Price came to his office in Minot some little time after the 12th of July and inquired of Burke himself, if Burke was in, not recognizing him, and, on being informed by Burke who he was, told him that he came to get his pay for drilling the well, that the well was all right and was 401 feet deep. Burke testifies positively that he never saw Price between the moment he spoke with him on June 3d and this interview in the office; that he had some talk with Price at that time at his office, and as a matter of compromise offered to measure the well, and if the well proved satisfactory to settle it at $1 a foot, which compromise offer plaintiff would not accept. But that before Burke would agree to do that he would want to measure the well and know it was that deep, and find out if it would give a sufficient supply of water to answer all the purposes that a well should, and that a well of that depth would necessitate a windmill. And testimony is offered bearing only on the equities of the case, that the well has always been worthless and has never been used, as appears from the testimony of half a dozen near neighbors to the land in question.

It is apparent that a substantial conflict exists in all facts upon which the liability of the defendant to pay for the well could be predicated. Under Burke's testimony his tenant was not authorized to drill any

new well, but merely to fix the old one. That Price did not rely on any authority from Myatt, on the theory that he was Burke's authorized agent in the first instance, is clear, because the proof is that Myatt sent Price to Burke and Price asked Burke for authority to dig the well. And here arises a direct conflict in testimony, and from the testimony of Burke and the bystander Strong, it would appear that Price was refused the job, which if true, and it would seem that the preponderance of the evidence here favors the defendant, Price thereafter acted at his peril in ever getting anything for his work, or taking just what Burke thereafter saw fit to pay. Plaintiff claims Burke referred him to Myatt. This Burke denies, and Strong's testimony supports Burke on this. Plaintiff has also sought to show a later implied consent sufficient under the mechanics' lien statute to obligate Burke to pay him for the well. In number of witnesses testifying on this point, the advantage is with the plaintiff; but the testimony of each witness, when carefully scanned and weighed, contains contradictions, inconsistencies, and matters of self-interest, to be considered in passing upon the question of credibility. Besides, the witnesses are testifying to matters four years old, and may follow their inclinations more or less and shade their testimony in plaintiff's favor without much fear of detection. In weighing the testimony as to time there is one thing we consider established to a reasonable certainty, and that is that Burke was not present at the farm in question between the interview with plaintiff in Velva on Sunday, June 3, 1907, until July 12th following, and that the testimony of witnesses who say they saw Burke at the place at an earlier time is not the fact. Neither is it probable that Burke had any interview with plaintiff in Sawyer. Plaintiff has testified to seeing Burke once on the farm prior to July 12th and to the conversation had with Burke on July 12th in Velva, which if it had occurred might have estopped defendant from denial of liability. And plaintiff has also testified that he never saw defendant on the farm. We accept the latter statement as the truth under all the probabilities. And the fact that there is in evidence a carbon copy of a letter from Burke to Myatt, dated at Minot June 19, 1907, would seem to be some proof that Burke was not there around that date, or he would not have taken the trouble to write the directions there given to his tenant. As to the condition of the well at the time of the single visit of Burke on July 12th, it

would seem to us that the preponderance of the evidence, notwithstanding the testimony of conclusions to the contrary, is in substantiation of the testimony of the defendant and to the effect that the well was completed and either tested or undergoing a test at that time, which test plaintiff testifies proved that the well was satisfactory and was then complete. The testimony of plaintiff and his witnesses Newman and Larent establishes the fact that three days' time was taken with this test, plaintiff and Larent and Newman all testifying that the test occupied three days' time. And latest date plaintiff will fix for the completion of the well is given in his direct examination as the 16th day of July, and on cross-examination "some time from the 11th to the 15th of July, I could not say the date;" and which date of completion has been fixed by him in his sworn statement of lien, filed within two months after the completion of the well, as July 11th. Granting that the pumping continued until the 15th, assuming his own testimony to be true, the well had been completed on the 12th, the date Burke was there, and when he was informed that it was complete and dug to a depth of 401 feet and had sufficient water because it had then been tested by pumping. At least, the testimony is in conflict as to the exact time of completion, as also as to whether the well was dug or not under a contract between Price and Burke, to such an extent that we must give weight to the findings of the trial court on these questions, it having found adversely to the plaintiff thereon by dismissing this action, and that "the services rendered by the plaintiff for which a claim of lien is made upon the premises described in the complaint were not rendered or performed under any contract between plaintiff and defendant, nor between plaintiff and any person authorized to act for or on behalf of the defendant." This explicit finding is supported by a preponderance of the proof on the question of contract, and under all the evidence we cannot say that plaintiff by a preponderance of the proof established any facts upon which defendant can be presumed to have consented to the making of such improvement, it not appearing from the proof that he had any knowledge that such labor was being performed or such improvement being made, assuming that it is an improvement, during the time the same was being dug; and it affirmatively appeared by substantial proof that his first knowledge thereof was after the same had been finished, since which time he has done nothing to estop him

from refusing to pay for such work performed by a trespasser. Appellant relies upon § 6237, Rev. Codes 1905, of the mechanics' lien law, providing that an owner shall be presumed to have consented to the making of an improvement if he had knowledge thereof and did not give notice of his objection to the person entitled to a lien. But under these facts this statutory provision can have no application, as manifestly the time mentioned in the phrase, "if at the time he had knowledge thereof," means at the time of the doing of the work or the making of the improvement, and does not apply to a case of this kind where the work was done and the improvement completed before knowledge of it was acquired.

Our mechanics' lien law, §§ 6237–6251, is a broad one, and grants to those who may by compliance with its terms obtain a mechanic's lien superior rights to those enjoyed by those not so favored. To comply with its terms is easy. The scope and method of proof in equity actions simplifies the establishment of any valid claim and places before a court all the facts and circumstances. Under such conditions the proof should disclose a clear right to recover. Any other rule is liable to result in confiscation of property, especially in cases similar to the one before us.

We affirm the judgment of the trial court dismissing this action.

BURKE, J., being disqualified did not participate.